Seth Fitzgerald **ROBBINS, a minor, by Erin Robbins and Kerry Robbins, his parents and natural guardians, and Erin Robbins and Kerry Robbins, in their own right, Appellants,**

v.

**CUMBERLAND COUNTY CHILDREN AND YOUTH SERVICES, the County of Cumberland, Gary I. Shuey, Individually and in his Official Capacity as Agency Administrator for Cumberland County Children and Youth Services, Dianne Rupp, Individually and in her Official Capacity as Case Work Supervisor for Cumberland County Children and Youth Services, Christina Runyon, Individually and in her Official Capacity as Case Worker for Cumberland County Children and Youth Services, Wendy B. Hoverter, Individually and in her Official Ca-**

---

pacity as Program Director for Cumberland County Children and Youth Services, and Darlene Orr, Individually and in her Official Capacity as Program Director for Cumberland County Children and Youth Services,

v.

**Susan Fitzgerald.**

Commonwealth Court of Pennsylvania.

Argued April 12, 2000.

Decided July 18, 2002.

Richard B. Druby, Harrisburg, for appellants.

Douglas B. Marcello, Harrisburg, for appellees.

Elizabeth A. Duffy, Philadelphia, for amicus curiae, Support Center for Child Advocates.

Anthony T. McBeth, Harrisburg, for amicus curiae, County Commissioners Assoc. of Hbg.

Before DOYLE, President Judge,[1] COLINS, Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, and LEADBETTER, Judge.

OPINION BY Judge LEADBETTER.

Seth Fitzgerald Robbins, a minor child, and his adoptive parents, Erin and Kerry Robbins, appeal from the order of the Court of Common Pleas of Cumberland County, which sustained preliminary objections and dismissed their complaint against all parties other than Susan Fitzgerald, Seth's natural mother.[2] The Robbins seek money damages under 42 U.S.C.

---

1. This case was assigned to the opinion writer prior to the date when President Judge Doyle assumed the status of senior judge on January 1, 2002.

2. Susan Fitzgerald was joined as an additional defendant. Finding that immediate appeal would facilitate resolution of the entire case, Common Pleas entered this dismissal as a final order pursuant to Pa. R.A.P. 341(c).

§ 1983 and State constitutional and tort law theories, alleging that Cumberland County Children and Youth Services, Cumberland County and several individually named directors, administrators and caseworkers (collectively "CYS") failed to protect Seth from physical abuse inflicted by Susan Fitzgerald. The Robbins allege that CYS and several of its employees failed to investigate properly allegations of child abuse in the Fitzgerald house and, had CYS acted with greater vigilance, the abuse suffered by Seth would have been prevented. As the scope of an appeal from an order sustaining preliminary objections necessarily raises only issues of law, our review is plenary. Finding that common pleas did not err in applying the law, in spite of the harsh result, we must affirm.[3]

This action arises out of the physical and psychological abuse suffered by Seth at the hands of Susan Fitzgerald. In 1995, Seth was three years old and lived with his mother and his two brothers in Silver Spring Township, Cumberland County. The first evidence of Fitzgerald's abusive behavior came to light on February 20, 1995, when Seth's older brother was taken to the emergency room with a complex fracture to his left forearm. Two days later, Seth's brother was admitted with a second forearm fracture, also inflicted by Fitzgerald. Based on two similar arm fractures, sustained just two days apart, the treating physician referred the case to CYS for investigation of possible child abuse. CYS assigned the matter to caseworker Christina Runyon for further investigation. On March 13, 1995, Ms. Runyon, accompanied by an officer from the Silver Spring Police Department, visited the Fitzgerald home. After the visit, Ms. Runyon advised the officer that she did not suspect abuse in the home and that she was going to close the file. No further criminal investigation was conducted at that time.

On March 28, 1995, Stephen, Seth's younger brother, sustained a similar fracture to his left forearm. CYS reopened the file and sent the x-rays of the fractures to an independent physician, Dr. Danielle Boal, M.D., who determined that the fractures were "unusual" and "remarkably similar" in kind and in proximity and that the injuries raised suspicions of abuse. Dr. Boal recommended a complete skeletal survey in the event that further fractures were sustained.

On June 2, 1995, Fitzgerald first injured Seth by fracturing his left arm and inflicting closed head injuries, multiple contusions and abrasions. Seth was taken to a different hospital and knowledge by CYS of this incidence of abuse is not alleged in the complaint. At some point prior to closing the file, Ms. Runyon made a second visit to the Fitzgerald home. However, despite knowledge of at least three nearly identical arm fractures sustained by the Fitzgerald children and the advice of Dr. Boal, she closed the file on June 19, 1995, noting again that the suspicions of abuse were invalid. CYS closed the file without investigating whether any further injuries were sustained by the Fitzgerald children and without obtaining any medical records for the boys.

---

3. Following argument before a panel of this court, we entered an order directing this matter for reargument before the court *en banc* and inviting *amicus curiae* participation on behalf of both parties. We have received the benefit of briefs as well as oral argument from the Support Center for Child Advocates who participated on behalf of the Robbins, while the Commonwealth's Office of General Counsel along with the County Commissioners Association of Pennsylvania submitted briefs and argued in support of Cumberland County Children and Youth Services.

On August 29, 1995, Stephen suffered a fatal seizure when Fitzgerald suffocated him with a pillow. The county coroner immediately initiated an investigation and reported that the death was suspicious and, as a result, ordered an autopsy. On August 30, 1995, CYS received a report that Stephen had suffered seizures in the past and had sustained a prior arm fracture. Ms. Runyon visited the Fitzgerald home the next day. She then requested the medical records of the Fitzgerald children and scheduled an additional home visit for September 12, 1995. However, despite the strong indicia of abuse, Ms. Runyon allowed Fitzgerald to reschedule the home visit for two weeks later and allowed Seth and his older brother to remain in her care. On September 12, 1995, the date of the cancelled visit, Fitzgerald attempted to suffocate Seth by placing a pillow over his face, thereby inducing a severe seizure. The next day, a team of CYS professionals removed the two remaining children from the Fitzgerald home.

The team opined that Stephen's death and the injuries suffered by the other two children could be the result of Munchausen Syndrome by Proxy.[4] CYS continued to investigate the allegations of abuse and concluded that Seth was very vulnerable to abuse due to his young age. After reviewing the medical evidence and speaking both to Seth and Fitzgerald, CYS concluded that the incidences of abuse involving Seth's fractured arm, laceration to the head and attempted suffocation were founded.

After the children were removed from the home, CYS assumed control over their placement and medical care as well as the terms and conditions of their visitation with Fitzgerald. Fitzgerald was permitted supervised visitation with Seth until her parental rights were terminated and Seth was adopted by the Robbins.

On April 2, 1998, the Robbins filed the underlying suit in the Court of Common Pleas of Cumberland County, alleging a cause of action under 42 U.S.C. § 1983 for due process violations pursuant to the Fourteenth Amendment, violations of the Pennsylvania Constitution and various State tort law claims. Specifically, the Robbins contend that as a result of ongoing abuse by Fitzgerald, which CYS permitted and facilitated, Seth suffered severe and permanent physical and mental injuries. On May 19, 1998, CYS filed preliminary objections in the nature of a demurrer. By order dated January 15, 1999, the trial court sustained the preliminary objections and dismissed all claims against CYS. Rejecting the Section 1983 claim, the court held that the defendants had no duty to protect Seth from incidences of private violence. Further, the defendants did not create the danger which resulted in his injuries, nor formed a special relationship with him that would serve to draw the defendants into a federal civil rights claim. The court further rejected the claim for violations of the Pennsylvania Constitution under the same substantive due process analysis. Finally, with regard to the State tort law claims, the court held that Cumberland County, Cumberland County CYS and the individual CYS directors, administrators and caseworkers were protected by governmental immunity. This appeal followed.

---

4. This syndrome has been defined as:

   a form of child maltreatment or abuse inflicted by a caretaker (usually the mother) with fabrications of symptoms and/or induction of signs of disease, leading to unnecessary investigations and interventions, with occasional serious health consequences, including death of the child.

   Stedman's Medical Dictionary 1736 (26th ed.1995).

When reviewing a challenge to an order sustaining preliminary objections in the nature of a demurrer, we must determine whether on the facts alleged the law states with certainty that no recovery is possible. *Anelli v. Arrowhead Lakes Cmty. Ass'n, Inc.*, 689 A.2d 357, 359 (Pa. Cmwlth.1997). We accept as true all well-pleaded allegations and material facts averred in the complaint, as well as inferences reasonably deducible therefrom, and resolve any doubt in favor of overruling the demurrer. *Id.* Preliminary objections calling for dismissal of a cause of action should be sustained only in cases that are clear and free from doubt. *Id.*

## FEDERAL CIVIL RIGHTS CLAIMS

In Counts I through V of their complaint, the Robbins assert civil rights violations under 42 U.S.C. § 1983, alleging that CYS is responsible for the harm inflicted upon Seth by Susan Fitzgerald in violation of his constitutional right to substantive due process under the Fourteenth Amendment.[5] Section 1983 provides a civil remedy for deprivations of federally protected rights caused by persons acting under color of State law. *Anselma Station, Ltd. v. Pennoni Assoc., Inc.*, 654 A.2d 608, 612 (Pa.Cmwlth.1995) (citing *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *rev'd on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). In determining whether plaintiffs have stated a cause of action under Section 1983, the inquiry must focus on whether the two essential elements of the action are present:

(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or the laws of the United States.

*Id.* (quoting *Parratt*, 451 U.S. at 535, 101 S.Ct. 1908, 68 L.Ed.2d 420). *See also* 42 U.S.C. § 1983. In general, the State has no constitutional obligation to protect individuals from harm inflicted by private actors. The seminal case in this area is *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), which also involved allegations that a county agency failed to protect a child from the abuse of a natural parent. CYS argues, and the trial court agreed, that *DeShaney* is directly on point and should control. The Robbins contend that the trial court disregarded a well-established line of cases, decided after *DeShaney*, which support their causes of action.

In *DeShaney*, the child and his mother brought an action in Wisconsin under Section 1983 against the county, the social services department and individual employees of the department. The plaintiffs alleged that the county had deprived the child of his liberty in violation of the Due Process Clause of the Fourteenth Amendment by failing to protect him against a known risk of violence perpetrated by the natural father. The Supreme Court held that the Due Process Clause imposes no affirmative duty on a State to protect an individual against private acts of violence:

[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as

---

**5.** The Fourteenth Amendment to the United States Constitution provides, in pertinent part, that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

a guarantee of certain minimal levels of safety and security.

*Id.* at 195, 109 S.Ct. 998, 103 L.Ed.2d 249. Thus, the Court concluded that, "[i]f the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *Id.* at 196–97, 109 S.Ct. 998, 103 L.Ed.2d 249.

In *DeShaney,* the Supreme Court also rejected the plaintiffs' arguments that the county parties were accountable under the special relationship and state-created danger theories. The Court limited application of the special relationship theory to situations where the State takes a person into its custody and holds him there against his will. The Court reasoned that:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs ... it transgresses the substantive limits on state action set by the [Federal Constitution's] Eighth Amendment and the [Fourteenth Amendment's] Due Process Clause.

*Id.* at 200, 109 S.Ct. 998, 103 L.Ed.2d 249.

With regard to the state-created danger theory, the Court rejected the plaintiffs' argument that since the State had created the danger to the child, it was thereby liable. In so holding, the Court stated that:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.

That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

*Id.* at 201, 109 S.Ct. 998, 103 L.Ed.2d 249.

Nonetheless, the Robbins contend that more recent cases in the courts of appeals provide a basis for holding CYS liable under the special relationship and state-created danger theories. We disagree. Even assuming that the lower federal courts have the authority to do so, none of the subsequent cases has undermined the clear limitations *DeShaney* placed upon these theories, and we find these limitations fatal to the Robbins' claims.

### 1. State–Created Danger Theory

■ Liability can arise under Section 1983 for acts committed by private citizens where the State creates the danger or risk of harm that led to the plaintiff's injury. *Kneipp v. Tedder,* 95 F.3d 1199, 1205–09 (3d Cir.1996). In *Kneipp,* police officers stopped a pedestrian and her husband while they were walking home from a bar. The officers sent the husband home and left the woman to walk home alone despite cold weather and obvious inebriation. The woman sustained severe injures when she fell down an embankment and suffered hypothermia and permanent brain damage. After reviewing cases finding a viable claim under the state-created danger theory, particularly *Cornelius v. Town of Highland Lake,*[6] and *Wood v.*

---

6. 880 F.2d 348 (11th Cir.1989), *reh. denied,* 887 F.2d 1093, *cert. denied sub.nom., Spears v.*

*Cornelius,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). In *Cornelius,* state prison

*Ostrander,*[7] the court reiterated the standards applicable to the doctrine,[8] and found:

> The conduct of the police, in allowing Joseph to go home alone and in detaining Samantha, and then sending her home unescorted in a seriously intoxicated state in cold weather, made Samantha more vulnerable to harm.... A jury could find that Samantha was in a worse position after the police intervened than she would have been if they had not done so. As a result of the affirmative acts of the police officers, the danger or risk of injury to Samantha was greatly increased.

officials instituted a work program which permitted inmates to work in public areas with access to dangerous weapons. The State then assigned an untrained, unarmed city employee to work with an inmate having a known history of violent behavior. The inmate abducted the employee and held her hostage, subjecting her to repeated physical and sexual threats. We note that in *White v. Lemacks,* 183 F.3d 1253, 1258, 1259 (11th Cir.1999), the Eleventh Circuit overruled *Cornelius* as inconsistent with *Collins v. City of Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), stating:

> Under *Collins,* government officials violate the substantive due process rights of a person not in custody only by conduct "that can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins,* 503 U.S. at 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 ...
>
> ....
>
> Like a favorite uncle who has passed away in the parlor, *Cornelius* needs to be interred. We do so now. Recognizing that it was dealt a fatal blow by *Collins,* we pronounce *Cornelius* dead and buried. The law on substantive due process when a citizen who is not in custody claims that a governmental unit, agency, or official has caused her harm is supplied by the *Collins* decision, which occupies the field to the exclusion of anything we said about such cases in *Cornelius.*

*Kneipp,* 95 F.3d at 1209. Concluding that the elements of a due process violation under the state-created danger doctrine had been averred, the court reversed the grant of summary judgment and remanded the case for trial.

In *Wood,* a woman who had been the passenger of a drunk driver was abducted and raped after the officer who arrested her companion stranded her in a high-crime area five miles from her home at 2:30 a.m. The court concluded that, "Wood has raised a genuine factual dispute regarding whether Ostrander deprived her of a liberty interest protected by the Con-

7. 879 F.2d 583 (9th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990).

8. In *Kneipp,* the Third Circuit recognized four common elements for imposing liability under the state-created danger theory:
   (1) the harm ultimately caused was foreseeable and fairly direct; (2) the State actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the State and the plaintiff; [and] (4) the State actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur. 95 F.3d at 1208 (quoting *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1152 (3d Cir.1995), *cert. denied,* 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995)). *See also Cannon v. City of Philadelphia,* 86 F.Supp.2d 460 (E.D.Pa. 2000), *aff'd,* 261 F.3d 490 (3d Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 212, 151 L.Ed.2d 151 (2001) (discussing *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), which clarified the standard of fault necessary to trigger liability under Section 1983 in a state-created danger claim). For purposes of this appeal, we do not address the first three elements discussed in *Kneipp,* as the fourth element is dispositive. We note only, like the Eleventh Circuit in *White,* and the District Court in *Cannon,* that the willful disregard standard encompassed in the second element would appear to conflict with the "shocks the conscience" standard mandated by the Supreme Court in cases such as *Collins* and *Lewis.*

stitution by affirmatively placing her in danger and then abandoning her." *Wood,* 879 F.2d at 596. Similarly, in *White v. Rochford,* 592 F.2d 381 (7th Cir.1979), a triable issue of fact under the Due Process Clause was found to have been raised by allegations of injury to three minor children. After arresting their uncle for drag racing on a cold night, police left the children alone in an automobile along the side of an eight-lane limited access highway. Both the officers on the scene and the police department refused pleas of the uncle and, later the children's mother, to take them to the police station or otherwise rescue them from their plight. As was noted in *Pearson v. Miller,* 988 F.Supp. 848, 854 (M.D.Pa.1997), "In each of these cases, the State's agent altered the plaintiff's situation in such a way as to place him or her in the path of a peril he had not faced before State intervention and then did nothing to remove or eliminate the risk that he had created."

■ Nonetheless, the Robbins cite *Kneipp* to argue that by failing to take action to remove the children, CYS "used their authority to create an opportunity which otherwise would not have existed for the specific harm to occur. *Plaintiffs need not show an affirmative act to fulfill this requirement.*" Appellants' brief at 21 (emphasis added). This assertion, however, is belied by the extended review of federal caselaw in *Kneipp,* which contrasts the cases of affirmative State action (where a claim was recognized) with the cases involving failure to act (where it was not) and concludes that, " '[l]iability under the state created danger theory is predicated upon the States' *affirmative acts* which work to plaintiffs' detriments in terms of exposure to danger.' " *Kneipp,* 95 F.3d at 1207 (quoting *D.R. v. Middle Bucks Area Vocational Tech. Sch.,* 972 F.2d 1364, 1374 (3d Cir.1992), *cert. denied,* 506 U.S. 1079,

113 S.Ct. 1045, 122 L.Ed.2d 354 (1993)) (emphasis added). *See also Estate of Burke v. Mahoney City,* 40 F.Supp.2d 274, 280–81 (E.D.Pa.1999), *aff'd,* 213 F.3d 628 (3d Cir.2000). While the Third Circuit has subsequently raised some question about this distinction in *Morse v. Lower Merion School District,* 132 F.3d 902, 914 (3d Cir. 1997) (noting that "the line between an affirmative act and an omission is difficult to draw"), we are persuaded that the approach taken by the *Kneipp* court, which is consistent with the holdings of the other federal circuits, is both sound and faithful to the holding of *DeShaney.* As the trial court noted in the case *sub judice,* the Supreme Court "expressly held that the State could not be considered to have created the danger to the minor plaintiff under circumstances even more compelling [*DeShaney*] than those of the present case [*Robbins*]." *Robbins v. Cumberland County Children and Youth Servs.,* No. 97–4669 (C.C.P. Cumberland County, filed January 15, 1999), slip op. at 14. (hereinafter Trial Court Opinion). Accordingly, we conclude that the Robbins have failed to allege a constitutional violation based upon the state-created danger theory.

**2. Special Relationship Theory**

■ The special relationship theory provides that liability can arise under Section 1983 for acts committed by private citizens only if the State entered into a special relationship with the plaintiff under which it assumed a duty to ensure the plaintiff's continued well-being. The Robbins allege that by accepting the referral of abuse, CYS accepted a duty to protect Seth from harm and entered into a special relationship with him and, despite that relationship, CYS acted with deliberate indifference and in reckless disregard of the high degree of foreseeable danger to Seth. However, as the Third Circuit noted in *Kneipp,* the relationship required under

the special relationship theory "has a custodial element to it—the State must affirmatively act to restrain an individual's freedom to act on his or her own behalf either through incarceration, institutionalization, or some other comparable limit of personal liberty." 95 F.3d at 1209 n. 22. *See also Collins,* 503 U.S. at 127–28, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) and *Pearson,* 988 F.Supp. at 855. This interpretation, like that regarding the state-created danger theory, is faithful to the concept set forth in *DeShaney,* that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." 489 U.S. at 200, 109 S.Ct. 998, 103 L.Ed.2d 249. Thus, because the complaint fails to allege any restraint by the State on Seth's personal liberty prior to his removal from the Fitzgerald home, the Robbins have failed to state a cause of action under the special relationship theory for the injuries which occurred while he remained in his mother's care.

However, the Robbins also assert a claim for violations of Seth's constitutional rights arising from conduct which occurred *after* Seth was taken into CYS custody. The Third Circuit has held, and we agree, that when the State places a child in foster care, the State enters into a special relationship with the child triggering affirmative duties on the part of the State. *Nicini v. Morra,* 212 F.3d 798 (3d Cir.2000) (en banc). Therefore, when CYS entered into a special relationship with Seth by placing him into foster care, a corresponding constitutional duty was imposed upon CYS to provide for his basic human needs, such as food, shelter, medical care and reasonable safety. *See DeShaney,* 489 U.S. at 200, 109 S.Ct. 998, 103 L.Ed.2d 249. The standard by which we determine whether this duty has been breached is whether CYS acted with such deliberate indifference to Seth's danger as to shock the conscience. *Nicini,* 212 F.3d at 810. However, the Robbins fail to assert facts which demonstrate how CYS breached this duty of care. The Robbins complain only that CYS allowed Seth supervised visitation with his mother during this period. They do not allege that Seth was further abused, or was in any danger of further abuse, only that contact with his mother caused additional psychological harm. Even assuming, *arguendo,* that a custodial relationship imposes a constitutional duty to attend to psychological health as a basic human need like food and medical care, we find this allegation inadequate to state a violation of Seth's constitutional rights. Having taken custody of Seth, CYS was faced with a Hobson's choice between cutting off, precipitously, all contact between a three-year-old child and the mother with whom he had lived since birth (and as to whom parental rights had not yet been terminated),[9] or allowing some continuing visitation in the physical presence and supervision of CYS officials. Whatever a psychologist might opine in hindsight, there are no facts alleged that even suggest that CYS knew, or even should have known,[10] that one option posed

---

9. In this regard it must be noted that the Supreme Court has recognized a "fundamental liberty interest of natural parents in the care, custody and management of their child." *Miller v. Philadelphia,* 174 F.3d 368 (3d Cir.1999) (citing *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). This tension between the rights of Fitzgerald and Seth further compounds the dilemma faced by CYS, and cautions restraint in finding a constitutional violation in CYS' ill-fated attempt to balance these rights.

10. As in *Nicini,* we need not here decide whether the deliberate indifference test is to

a greater psychological risk of harm than the other. We do not believe that the selection of either option can amount to deliberate indifference to Seth's safety and well being, absent some additional circumstances not alleged here.

### 3. Failure to Train

■ A claim of liability under Section 1983 is also grounded upon the theory that CYS failed to properly train and supervise caseworkers, specifically Ms. Runyon. A municipality's failure to train employees can serve as the basis for Section 1983 liability where the failure to train is the "moving force" behind a constitutional violation. *See City of Canton v. Harris,* 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In light of our disposition of the underlying claims based upon the caseworkers' failure to protect Seth from his mother, we must conclude that preliminary objections were properly sustained to this claim as well. To recover under Section 1983 based upon a failure to train the municipal actors who caused the plaintiff's harm, a plaintiff must establish both that "1) the failure to train amounted to a deliberate indifference to the rights of persons with whom the police come in contact; and 2) the municipality's policy actually caused a constitutional injury." *Carroll v. Borough of State Coll.,* 854 F.Supp. 1184, 1195 (M.D.Pa.1994), *aff'd,* 47 F.3d 1160 (3d Cir.1995). While most failure to train caseworkers have dealt with questions regarding the deliberate indifference element, the existence of a constitutional deprivation is a fundamental threshold requirement of any Section 1983 claim. As the Supreme Court noted in *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986):

> [N]either *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.

(emphasis in original). Thus, the constitutionality of a municipal policy is irrelevant in the absence of a constitutional injury causally related to that policy. *See Simmons v. Philadelphia,* 947 F.2d 1042, 1063 (3d Cir.1991). Accordingly, since there was no breach of any constitutional duty owed to Seth by any State actor, no Section 1983 claim could be sustained even if the Robbins were able to uncover some municipal policy which might be characterized as deliberate indifference.

To the extent that the Third Circuit in *Fagan v. City of Vineland,* 22 F.3d 1283 (3d Cir.1994) has held to the contrary,[11] we reject this construction of Section 1983 as inconsistent with pronouncements of the Supreme Court, particularly *Heller.*[12] Rather, we accept the reasoning of the

---

be measured by the risks known to CYS or the risks of which they should have been aware. However, we note that in a prison condition case, the Supreme Court applied the actual knowledge standard. *See Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

**11.** We note that in *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1153 n. 13 (3d Cir.1995), a panel of the Third Circuit questioned the extent of the holding in *Fagan.* We do not here attempt to explore this question.

**12.** *See also Collins,* 503 U.S. at 124, 112 S.Ct. 1061, 117 L.Ed.2d 261.

vast majority of federal circuits, which adopt the general rule that a municipality cannot be liable unless there is a constitutional violation by the municipal actor causing the plaintiff's harm. *See, e.g., Trigalet v. City of Tulsa,* 239 F.3d 1150, 1154–56 (10th Cir.2001), *cert. denied,* 516 U.S. 932, 116 S.Ct. 340, 133 L.Ed.2d 238 (1995); *Scott v. Clay County,* 205 F.3d 867, 879 (6th Cir.), *cert. denied,* 531 U.S. 874, 121 S.Ct. 179, 148 L.Ed.2d 123 (2000); *Evans v. Avery,* 100 F.3d 1033, 1039–40 (1st Cir. 1996), *cert. denied,* 520 U.S. 1210, 117 S.Ct. 1693, 137 L.Ed.2d 820 (1997); *Thompson v. Boggs,* 33 F.3d 847, 859 n. 11 (7th Cir. 1994), *cert. denied,* 514 U.S. 1063, 115 S.Ct. 1692, 131 L.Ed.2d 556 (1995). Moreover, even under the *Fagan* analysis, there still must be constitutional injury. *See Estate of Burke v. Mahoney City,* 40 F.Supp.2d at 285–87. Since the rejection of the Robbins' primary causes of action against the individual actors is based upon the principle that the State has *no constitutional duty* to protect citizens from the acts of other private citizens, even under *Fagan* there could be no direct claim against the municipal defendants for failure to train and supervise caseworkers to detect and prevent private abuse.

### 4. Child Protective Services Law

■ The Robbins' final theory of liability under Section 1983 asserts that CYS violated the Child Protective Services Law, 23 Pa.C.S. §§ 6301–6385, by failing to obtain necessary medical evidence and failing to properly investigate claims of abuse. Mere violation of State law does not give rise to a constitutional claim. Liability under Section 1983 can be predicated only upon violation of federal statutory or constitutional rights. *See Kneipp,* 95 F.3d at 1210. Nonetheless, State law may create a right in property or liberty, which interest is then protected by the Federal Due Process Clause. In turn, a deprivation of due process by the State can form the predicate of a Section 1983 claim. However, as the Supreme Court pointed out in *Collins,* even where State law imposes a duty not otherwise imposed by the federal constitution and that duty creates a "liberty interest" protected by the Due Process Clause, breach of that duty does not rise to the level of a Section 1983 violation unless the State action is itself arbitrary and capricious in the constitutional sense. 503 U.S. at 129–30, 112 S.Ct. 1061, 117 L.Ed.2d 261. As in *Collins,* none of the facts pled here would support such a claim.

### PENNSYLVANIA CONSTITUTIONAL CLAIMS

■ The Robbins also assert a direct cause of action under the Pennsylvania Constitution, alleging that CYS deprived Seth of his right to liberty and to be free from physical harm guaranteed by Article I, Section 1.[13] Neither party has briefed the difficult issue of whether there exists a direct right of action for money damages against government officials for violations of the Pennsylvania Constitution, and our research has not uncovered any case where such a cause of action was recognized.[14] Nevertheless, even if a direct cause of action may be maintained, our

---

13. Article I, Section 1 of the Pennsylvania Constitution provides:

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Pa. Const. art. I, § 1.

14. *But see Harley v. Schuylkill County,* 476 F.Supp. 191, 195–96 (E.D.Pa.1979) (citing *Erdman v. Mitchell,* 207 Pa. 79, 56 A. 327 (1903)).

analysis of the Federal Due Process clause resolves the State constitutional claims under Article I, Section 1. The Pennsylvania Supreme Court has held that "the requirements of Article I, Section 1 of the Pennsylvania Constitution are not distinguishable from those of the [Due Process Clause of the] 14th Amendment . . . [thus] we may apply the same analysis to both claims." *Pennsylvania Game Comm'n v. Marich*, 542 Pa. 226, 229 n. 6, 666 A.2d 253, 255 n. 6 (1995) (citing *R. v. Department of Public Welfare*, 535 Pa. 440, 461–62, 636 A.2d 142, 152–53 (1994)). Accordingly, we agree with the trial court that the Robbins have failed to state a claim under the Pennsylvania Constitution.[15]

## STATE TORT CLAIMS AND PUNITIVE DAMAGES

We likewise conclude that the trial court properly dismissed the State tort law claims. The Robbins assert a cause of action in negligence as well as claims under Sections 324 and 46 of the Restatement (Second) of Torts for intentional infliction of emotional distress and, in a separate count, they seek punitive damages. Specifically, the Robbins contend that CYS acted with gross negligence and in willful disregard for, and in deliberate indifference to, Seth's safety. While the Robbins concede that CYS in its capacity as a local agency would be immune from liability, they contend that the conduct of the individual employees constituted willful misconduct serving to vitiate their immunity.

■ Under 42 Pa.C.S. §§ 8541–8542, commonly referred to as the "Political Subdivision Tort Claims Act," local agencies are immune from liability for injuries caused by an act of the agency, its employees or any other person. *See* Section 8541.[16] Section 8545 grants the same immunity to an employee of the local agency acting within the scope of his official duties.[17] This immunity is abrogated, with respect to individuals only, for conduct constituting a crime, actual fraud, actual malice or willful misconduct. *Diaz v. Houck*, 159 Pa.Cmwlth. 274, 632 A.2d 1081, 1085 (1993). *See also* 42 Pa.C.S. § 8550. In *King v. Breach*, 115 Pa.Cmwlth. 355, 540 A.2d 976, 981 (1988), we noted the type of behavior which constitutes willful misconduct:

> Willful misconduct, for the purposes of tort law, has been defined by our Supreme Court to mean conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied. *Evans v. Philadelphia Transpor-*

15. Assuming, *arguendo*, that a direct cause of action would be cognizable under the State constitution, immunity under 42 Pa.C.S. §§ 8541–8546, would serve to bar any State constitutional claims asserted against CYS. *See* Section 8542(b) (granting immunity for claims for monetary damages except with respect to eight specific types of conduct, none of which is applicable here). *See also Samer-ic Corp. v. City of Philadelphia*, 142 F.3d 582, 600 (3d Cir.1998). *See also Agresta v. Goode*, 797 F.Supp. 399, 409 (E.D.Pa.1992).

16. That section is as follows:
§ 8541. Governmental immunity generally
Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.
42 Pa.C.S. § 8541.

17. That section is as follows:
Section 8545. Official liability generally
An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency and subject to the limitations imposed by this subchapter.
42 Pa.C.S. § 8545.

*tation Company,* 418 Pa. 567, 212 A.2d 440 (1965). In other words, the term "willful misconduct" is synonymous with the term "intentional tort." *See* W. Prosser, *Handbook of The Law of Torts,* 31 (4th ed.1971).

To prove willful misconduct, a plaintiff must establish that the actor desired to bring about the result that followed, or at least it was substantially certain to follow, *i.e.,* specific intent. *Diaz,* 632 A.2d at 1085. We conclude here that the allegations do not state a claim that any of the individual appellees acted with the requisite specific intent to injure Seth. As the trial court noted:

> [A] fair reading of the factual allegations regarding the Defendants' conduct, and the reasonable inferences to be drawn therefrom, if believed, do not support a conclusion that any of the individual defendants acted with malignant feelings or a wicked disregard of the interests of the minor plaintiff. Nor do they support a conclusion that any such defendant acted with an intent that the minor plaintiff be injured, or with an awareness that his injuries were substantially certain to occur. At most, the complaint presents a series of events in which an error of judgment by a defendant in failing to recognize an unusual personality disorder in the minor plaintiff's mother resulted in the most tragic of consequences.

Trial Court Opinion at 19.

■ Finally, we note our agreement with the trial court that punitive damages are a form of relief, not a separate cause of action under Pennsylvania law. *See Murray v. Gencorp, Inc.,* 979 F.Supp. 1045 (E.D.Pa.1997).[18]

## CONCLUSION

In conclusion, we reiterate the U.S. Supreme Court's observation in *DeShaney:*

> Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for [the injured] to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State ... but by [the victim's natural parent]. The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.
>
> . . . .
>
> The people of Wisconsin may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one. They may create such a system, if they do not have it already, by changing the tort law of the State in accordance with the regular lawmaking process. But they should not have it thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment.

*DeShaney,* 489 U.S. at 202–203, 109 S.Ct. 998, 103 L.Ed.2d 249. Accordingly, we affirm the court's order sustaining CYS' preliminary objections and dismissing the complaint.

## ORDER

AND NOW, this 18th day of July, 2002, the January 15, 1999 order of the Court of Common Pleas of Cumberland County in

---

18. Having determined on the facts as averred that CYS is not liable for the harm suffered by Seth, it is unnecessary to grant the Robbins an opportunity to re-plead punitive damages as a prayer for relief in the substantive counts of the complaint. Further, punitive damages may not be assessed against a municipality or against individual defendants sued in their official capacities. *Agresta,* 797 F.Supp. at 410.

the above-captioned matter is hereby AF-FIRMED.

## DISSENTING OPINION BY Judge SMITH–RIBNER.

I dissent from the majority's decision to affirm the order of the Court of Common Pleas of Cumberland County. The trial court sustained Appellees' preliminary objections and dismissed Appellants' nine-count complaint raising claims of civil rights violations, a failure to protect Appellant Seth Fitzgerald Robbins, a minor, and an infliction of emotional distress in connection with permanent injuries caused by the minor child's biological mother. I also disagree with the majority that this case must be strictly construed under the rubric of *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), among other cases, and that Appellants do not have viable state-related causes of action against Appellees. The majority has denied Appellants their right to have the facts of their case determined by a reasonable jury, not by this Court.

In *DeShaney* the United States Supreme Court held that the state had no constitutional duty to protect a child from his father after the state had received reports of the father's abuse. The court denied the child's civil action under 42 U.S.C. § 1983 against social workers and local officials who received complaints that the child was abused but failed to take any action to remove the child.[1] The court reasoned that the Due Process Clause of the Fourteenth Amendment imposes no affirmative obligation on the state to pro-

tect life, liberty or property of a citizen against invasion by a private actor. Moreover, while the state may have been aware that the child was in danger no special relationship existed between the child and the state, which played no role in creating the danger that the child faced nor did anything to render the child more vulnerable to the danger.

Appellants request this Court to reject a strict reliance upon *DeShaney* and to apply exceptions to the general rule that the Due Process Clause provides no basis for a Section 1983 cause of action. Those exceptions provide that a duty to protect may arise out of certain special relationships between the state and the injured child or when a state-created danger or risk of harm exists which causes injury to the plaintiff. *Kneipp v. Tedder,* 95 F.3d 1199, 1208 (3d Cir.1996). Unlike the majority, I am convinced that the state-created danger theory should be applied to Appellants' case, which imposes liability under Section 1983 for acts committed by a private citizen when the danger or risk of harm causing the plaintiff's injury was created by the state. The *Kneipp* court agreed that *DeShaney* left open the possibility that a constitutional violation may occur despite the absence of a special relationship. The court enunciated a four-part state-created danger test that a plaintiff must meet to prevail:

(1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and

---

1. The petitioner's Section 1983 cause of action alleged that the respondents deprived the child of his substantive rights under the Due Process Clause of the Fourteenth Amendment by failing to protect him against his father's abuse. Although custody was initially withheld, the court returned the child to his father after two doctors, a police detective, social service caseworkers, hospital personnel and the county attorney jointly determined that because insufficient evidence of child abuse existed, the child could no longer remain in the court's custody, particularly where in this instance the father denied any abuse.

the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

If properly analyzed under the *Kneipp* test the facts as averred demonstrate, first, that the reasoning in *DeShaney* for denying relief does not apply. The Supreme Court decided the case strictly on a special relationship test, which I agree does not apply here, and at no time did the court foreclose relief under the state-created danger theory when appropriate factual circumstances exist. It did not rule that a special relationship is a prerequisite to state liability in all cases of injury due to private violence. Second, if believed by a jury, the facts as averred demonstrate that the harm suffered by Seth was foreseeable and direct, that state actors acted in a willful disregard for the child's safety, that some relationship existed between the state and the child and that state actors used their authority to create an opportunity for Seth's mother to abuse him. That opportunity otherwise would not have existed but for the state actors' conduct.

An analogous situation was presented in *Ford v. Johnson*, 899 F.Supp. 227 (W.D.Pa.1995), *aff'd*, 116 F.3d 467 (3d Cir. 1997). The District Court for the Western District of Pennsylvania denied the CYS defendants' motion to dismiss a civil action filed by a biological mother arising out of the death of her two-year-old child, Shawntee Ford. The child was beaten to death by her father after he was granted custody by the family court in Allegheny County. The district court held that where CYS takes affirmative action to remove a child from a parent and then returns the child to the same household and the parent thereafter inflicts injury, CYS has created a danger that would not have otherwise existed. According to the court: "The fact that the child is placed with a

parent as opposed to a foster parent should not change the standards by which social agencies and their employees conduct their investigations." *Ford*, 899 F.Supp. at 233. The complaint averred that CYS failed to investigate the father's circumstances and to report known information, which would have disqualified him from regaining custody of the child.

The district court in *Ford* adopted the state-created danger theory, which permitted the plaintiff to prove liability against the CYS defendants if she could establish that state actors created a dangerous environment, knew that it was dangerous and used their authority to create an opportunity otherwise unavailable for a third party to commit a crime. Evidence must exist to show the defendants' indifference to the child's conditions. *Id.* The reasoning and holding in *Ford* are particularly persuasive here where Seth clearly was under CYS' authority and supervision by virtue of the agency's open case files on the family and the affirmative duty on CYS to monitor, supervise and investigate what went on in the child's home after it acquired information about the series of abuses perpetrated against Seth and his brothers, their hospitalizations and the death of Seth's oldest brother Stephen. *See also Currier v. Doran*, 242 F.3d 905 (10th Cir.2001) (citing *Ford*, among other cases, the court applied the state-created danger theory and held that state officials may be liable for injuries caused by private actors when the officials create danger that leads to harm).

CYS only made three scheduled visits to the Fitzgerald home before Susan Fitzgerald was ultimately arrested for murdering Stephen. Once CYS intervened in March of 1995, it assumed an affirmative duty to protect Seth and to put Susan Fitzgerald on notice that her behavior and the care of her children would be monitored and investigated. Seth was again injured on

September 12, 1995 when his mother tried to suffocate him. CYS was scheduled to make a home visit that day but allowed Susan Fitzgerald to cancel the home visit despite CYS's knowledge of Stephen's death on August 29. CYS had authority to monitor and to investigate the mother's care of her children, and it was CYS' conduct and indifference to this responsibility, which created a known dangerous environment for Seth leading up to his sustaining permanent injuries at the hands of his mother.

Next, I note that the act commonly known as the Political Subdivision Tort Claims Act, 42 Pa.C.S. §§ 8541–8564, grants general immunity to employees of the local agency if an employee acting within the scope of his or her duty causes an injury to a person or to property. 42 Pa.C.S. § 8541. However, an individual employee is not protected from liability for "acts that are judicially determined to be a crime, actual fraud, actual malice or willful misconduct." 42 Pa.C.S. § 8550. Under the facts averred, Ms. Runyon and CYS acted with a willful disregard of their duties and for the safety and welfare of Seth when dealing with Seth's circumstances. In *Ford* the court applied the definition of willful disregard as reckless, willful or wanton misconduct, *see* 42 Pa. C.S. § 8336(d), and it followed this definition when denying CYS' motion to dismiss based on governmental immunity. The court construed the plaintiff's allegations against CYS defendants as acts constituting willful misconduct which barred their claims of immunity.

There is every possibility that a jury may determine that CYS employee behavior amounted to willful, reckless or wanton misconduct. CYS failed to request medical records of the Fitzgerald children until after Stephen was murdered by his mother. In February of 1995 CYS received a child abuse referral from a physician after Stephen suffered a forearm fracture, but it closed the case file after only a cursory and inadequate review. Over the next three months, all three of Susan Fitzgerald's children suffered serious and severe injuries, including fractures, concussions and laceration to the head, closed head injury and contusions and abrasions requiring hospitalizations. CYS reopened its file and again closed it in June of 1995 after determining that suspicions surrounding the children's injuries were invalid and that it had no duty to proceed further despite such overwhelming evidence of child abuse. The injuries to Seth and his brothers continued, but CYS allowed Seth to remain with his mother without taking reasonable or proper action to protect the child. Finally CYS allowed the mother to cancel CYS' scheduled home visit on September 12, 1995, less than two weeks after Stephen's death.[2]

2. As for whether a cause of action for the intentional infliction of emotional distress may be entertained, I note that Appellees' conduct may be characterized at best as extreme and outrageous and that Appellants have set forth a viable cause of action for intentional infliction of emotional distress. Appellants cite *Hunger v. Grand Central Sanitation*, 447 Pa.Super. 575, 670 A.2d 173 (1996), where the Superior Court set forth the applicable standard in determining a cause of action for intentional infliction of emotional distress. A plaintiff must prove that the defendant's conduct was extreme and outrageous and that the plaintiff suffered a medically confirmed injury. Appellees rely on *Armstrong v. Paoli Memorial Hospital*, 430 Pa.Super. 36, 633 A.2d 605 (1993) (citing *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A.2d 988 (1987)), for the proposition that Pennsylvania has not adopted the cause of action of intentional infliction of emotional distress as defined in the Restatement. In *Kazatsky* the court held that in order to prevail on an intentional infliction of emotional distress cause of action the plaintiff must provide competent medical

When viewed in the light most favorable to Appellants, the facts as averred, if proved at trial, support the conclusion that Appellants have plead viable causes of action and that the trial court erred in granting the preliminary objections. This case is not about whether judges or attorneys may be "moved by natural sympathy" to identify ways to compensate an injured litigant. *DeShaney.* Rather the singular and fundamental issue before the Court is whether Appellants have sufficiently averred facts entitling them to recover damages for the permanent injuries suffered by Seth in a known dangerous environment. It is for the jury to decide, among other factors, whether the facts presented constitute state actors' willful disregard for Seth's safety and constitute a known dangerous condition created by state actors. *See e.g. Armstrong v. Squadrito,* 152 F.3d 564 (7th Cir.1998) (whether an actor's conduct constitutes deliberate indifference is for the fact finder to determine). The order of the trial court should be reversed, and this case should be remanded for trial.

Judge FRIEDMAN joins in this dissenting opinion.

evidence to prove the existence of emotional distress. The court neither adopted nor rejected Section 46 of the Restatement (Second) Torts but merely stated what the plaintiff's burden should be if Section 46 were accepted. *See Hoy v. Angelone,* 554 Pa. 134, 720 A.2d 745 (1998) (holding that the factor of retaliation is a consideration in recovering for intentional infliction of emotional distress in a sexual harassment case).

Furthermore, I agree that *punitive damages* are a form of relief and are not a separate cause of action. Appellants acknowledge that they erroneously pleaded punitive damages as a cause of action. According to *Brennan v. National Telephone Directory Corp.,* 850 F.Supp. 331 (E.D.Pa.1994), if a plaintiff asserts punitive damages in a separate cause of action, the plaintiff should be granted leave to replead her claim for punitive damages as an appropriate substantive claim for damages.